## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ROCKY L. PAIGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO 04-0461-WS-L |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income. This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B). The undersigned has determined that oral argument is unnecessary to resolve the matter. See Local Rule 7-3 of the United States District Court for the Southern District of Alabama. Upon consideration of the administrative record, and the memoranda of the parties, it is recommended that the decision of the Commissioner be **affirmed .**

## I.    Issues on Appeal

1. Whether the Administrative Law Judge (ALJ) erred by failing to find that plaintiff's severe impairments met or equaled a listing in the Listings of Impairments. 20 C.F.R. Pt. 404 Subpt. P, App.1.

2. Whether the ALJ should have applied the Medical-Vocational Guidelines to determine that plaintiff was disabled. 20 C.F.R. Pt. 404 Subpt. P, App. 2.

3.  Whether the number of jobs identified by the ALJ constitutes a significant number of jobs in

the national and local economy.

4. Whether the ALJ erred by failing to discuss or mention all of plaintiff's medication.

5. Whether the ALJ properly assessed plaintiff's subjective complaints of disabling pain.

## II.    **Background Facts**

Plaintiff was born on September 1, 1954, and was 48 years old at the time of the administrative hearings on January 28, 2003 and June 3, 3003. (Tr. 397, 78, 72-114, 115-123).)   Plaintiff has a tenth grade education. (Tr. 408).  He has past relevant work as a laborer, industrial cleaner, forklift operator, and dairy machine operator. (Tr. 98, 119, 403).  Plaintiff alleges that he became unable to work on July 23, 2001, because of neck and back injuries resulting from a motor vehicle accident. (Tr. 397, 74, 79).

## III.   **Procedural History**

Plaintiff applied for Supplemental Security Income on May 15, 2002 with a protective filing date of April 1, 2002. (Tr. 396-399).[1]  The application was denied on August 23, 2002. (Tr. 354-365, 378-382).[2]  On January 28, 2003 and June 3, 2003, hearings were held before the ALJ and plaintiff, his attorney and a vocational expert (VE) were present. (Tr. 72-114, 115-123).  On June 18, 2003, the ALJ entered a decision wherein he found the plaintiff not disabled. (Tr. 17-27).  On May 10, 2004, the Appeals Council denied the request for review and the hearing decision became the final decision of the Commissioner of Social Security. (Tr. 11-13).

---

[1]  Plaintiff previously applied for benefits in 1990, (Tr. 124-156), 1997 (Tr. 157-180, 194-205, 350-362), and 1999 (Tr. 207-255, 366-377).

[2]  The reconsideration stage was eliminated from this case pursuant to a test of modifications to the disability determination process. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

IV.    <u>**Findings of the Administrative Law Judge**</u>

The ALJ found plaintiff has the severe impairments of right eye blindness, hypertension, diabetes mellitus, lumbar disc disease, cervical disc disease, gouty arthritis, degenerative disease in the right elbow and borderline intellectual functioning. (Tr. 22). The ALJ determined that these impairments singly or in combination did not meet or medically equal a listing in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 22). He also found plaintiff's subjective complaints were not fully credible. (Tr. 25, 26). The ALJ determined that plaintiff has the residual functional capacity for light work but was restricted to occasional stooping, avoiding exposure to concentrated temperature changes and could perform no work which requires binocular vision. (Tr. 24, 26). The ALJ found plaintiff could not return to his past relevant. (Tr. 25). Based upon the testimony of the vocational expert, the ALJ determined plaintiff could perform other work which exists in significant number in the national economy and was not disabled. (Tr. 25-27).

V.    <u>**Plaintiff's Testimony**</u>

At the hearings, plaintiff testified as follows:

Plaintiff testified that he completed the tenth grade and can perform simple reading, writing, and math. He took the written examination twice to receive his driver's license. (Tr. 78). He lives alone in a house he inherited from his father and has no power or water. (Tr. 88-89). He injured his back in an automobile accident in July 2001 and was treated at the emergency room. (Tr. 79-80). He previously injured his back in an accident in 1994. (Tr. 80). Following the recent accident, he was treated for a few months by a chiropractor. (Tr. 81-83). He tried to do yard work to earn money but he could not because his condition worsened. (Tr. 84-85, 118).

3

Plaintiff testified that he cannot work because of high blood pressure.  He takes medication which works but makes him feel lightheaded.  He takes a daily pill for diabetes and follows a diabetic diet. (Tr. 86-88).  He has headaches when his blood sugar rises, but the diabetic medication helps to control the headaches. (Tr. 89).  He received a bad wound in his neck which causes pain twenty four hours a day in his neck, shoulders and back.  The pain is increased with hot or cold weather. (Tr. 91).  Plaintiff takes Ibuprofen and Arthrotec every day for pain.  He has taken Soma, a muscle relaxer, which works better than Arthrotec.  The pain is worse since the accident. (Tr. 92).

Plaintiff has tenderness and pain in his right elbow and he is right-handed. (Tr. 94).  He also takes Ibuprofen and Arthrotec for this pain. (Tr. 95).  The medicines help but "don't soothe the problem" or take away his pain. (Tr. 95, 102).  He has pain when he tries to shake someone's hand or lift a cup of coffee. (Tr. 103, 96).  He could not pick up a gallon of milk on a regular basis. (Tr. 96).  His left arm also hurts but not as bad. (Tr. 103).

Plaintiff uses a cane because he is on medication which causes drowsiness and he has gout in his feet. (Tr. 95).  He takes medication and watches his diet to treat the gout. (Tr. 96).  He can walk without the cane but not as far. (Tr. 102).  If he walks too far his legs will tingle and buckle and he will fall. (Tr. 102).  He can stand ten or fifteen minutes before needing to sit. (Tr. 96).  He can sit for about thirty minutes before he needs to stand to stretch and can walk about a half of a block. (Tr. 97).

Plaintiff has bad knees which affect his ability to squat and walk.  He has bad kidneys for which he takes medication. (Tr. 97).  He also has pain in the left side of his chest on a regular basis for which he takes medication. (Tr. 98).  Plaintiff is blind in his right eye and wears prescription bifocal glasses for reading and distance and to block out sunlight. (Tr. 101-102).

4

Plaintiff sleeps poorly for about two or three hours each night because of pain.  Each day, he

prepares food such as sandwiches to eat with his medications.  He feels better when the medication

begins to work.  He tries to do light housework when he feels up to it but usually he is hurting. (Tr. 99).

He has friends who help him shop. (Tr. 104).  Plaintiff's therapist recommended he try outdoor chores

so he mows his small lawn with a riding lawn mower. (Tr. 99-100, 104).  He takes his medications

around 11:00 in the morning and they cause drowsiness and nausea. (Tr. 105-106).

**VI**.      **Vocational Expert Testimony**

At the second hearing, the ALJ began by questioning the VE regarding the testimony of the VE

who testified at plaintiff's first hearing.  The second VE testified that the VE at the prior hearing, based

upon the state agency examiner's findings (the restriction to occasional stooping)[3], properly determined

plaintiff could not perform his past relevant work as an industrial cleaner. (Tr. 119).  The second VE

also agreed with the prior VE's opinion that based upon the state agency examiner's findings and a

vocational profile of a hypothetical person forty-eight years of age, with a tenth grade education and

borderline intellectual functioning, the hypothetical person could perform the jobs of stock inventory

clerk, food preparer, and janitorial cleaner.  (Tr.120).

The second VE also agreed with the prior VE's opinion that if full credibility was given to

plaintiff's testimony regarding his functional limitations (lifting less than five pounds on occasion, standing

ten to fifteen minutes, sitting thirty minutes, walking half a block or less) he could perform no work. (Tr.

---

[3]  The non-examining agency physician found plaintiff could perform medium exertional work
with occasional stooping, no exposure to concentrated temperature extremes and work that did not
require binocular vision. (Tr. 500-508).

5

120).

Based upon a hypothetical question including the same vocational profile but with the exertional and functional limitations identified by the consultative examiner [4] and the restrictions identified by the state agency examiner, the VE testified that there were light unskilled jobs that the hypothetical person could perform. (Tr. 120-121, 532).  The VE identified the jobs of table attendant which included 60 positions locally, 2,277 statewide and 372,053 nationally; cleaner such as an office cleaner which included 355 positions locally, 2,688 statewide and 177,404 nationally; and parking lot attendant which included 45 positions locally, 156 statewide and 45,102 nationally. (Tr. 121-122).

## VII.   Analysis

### A.      Standard of Review.

In reviewing claims brought under the Act, this court's role is a limited one.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such

---

[4] R. Eugene Bass, M.D. consultatively examined plaintiff on March 15, 2003.  He found plaintiff was limited to light exertional work.  He also found plaintiff could sit, stand, and walk two hours each at a time and up to six hours each during an eight hour day; lift and carry up to ten pounds frequently and lift and carry up to twenty pounds occasionally; was unlimited in the use of his arms and legs; could occasionally bend and climb several steps, and frequently reach but could not squat, crawl or climb ladders. (Tr. 532).  He also found plaintiff was moderately  restricted from work involving hazardous machinery and driving automotive equipment and totally restricted from work around unprotected heights. (Tr. 532).

relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971);  Bloodsworth, 703 F.

2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence

even when a court finds that the preponderance of the evidence is against the decision of the

Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); Bloodsworth, 703 F.2d at

1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking

into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v.

Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Further, it has been held that the Commissioner's "failure

to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that

the proper legal analysis has been conducted mandates reversal." Cornelius v. Sullivan, 936 F.2d 1143,

1145-46 (11th Cir.1991).  This court's review of the Commissioner's application of legal principles is

plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

### B.    Statement of the Law

An individual who applies for Social Security disability benefits or supplemental security income

must prove their disability.  See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912.  Disability is defined as

the "inability to do any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §

404.1505(a); 20 C.F.R. § 416.905(a).   The Social Security regulations provide a five-step sequential

evaluation process for determining if a claimant has proven their disability.  See 20 C.F.R. § 404.1520;

20 C.F.R. § 416.920.  At the first step, the claimant must prove that he or she has not engaged in

substantial gainful activity.  At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id., at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity and age, education, and work history. Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

### C.      Medical Evidence

In August 1994, plaintiff sought hospital treatment for neck and back pain the day after an automobile accident.  His radiology results were negative for injury and he was discharged with instructions to take Tylenol. (Tr. 304-305).  In October 1994, after trying physical therapy, plaintiff was

treated for chronic back and neck pain by Vincent Virgadama, M.D. (Tr. 308-316).  Initially, Dr.

Virgadama noted "a moderate degree of paraverterbral, cervical and lumbar spasms"and diagnosed

post traumatic cervical and lumbar sprain. (Tr. 316).  Plaintiff's MRI of his cervical spine was normal

and plaintiff was referred for more therapy. (Tr. 312-310).  At plaintiff's last visit, Dr. Virgadama "did

not find any limitation of motion of the cervical and lumbar spine" and recommended continued home

exercises and use of the TENS unit. (Tr. 308).

From November 1, 1999 through the time of the ALJ's decision in 2003, plaintiff was treated

at Franklin Primary Health Center by Marion Carroll, M.D.[5]  On November 1, 1999, plaintiff

complained of back, neck, right shoulder and right elbow pain and reported right eye blindness. (Tr.

322-323).  On November 11, 1999, the x-ray of plaintiff's right shoulder and elbow showed "severe

degenerative joint disease of the right elbow." (Tr. 324).  On November 15, 1999, Dr. Carroll noted

plaintiff's pain was controlled with non-steroidal anti-inflammatory (NSAID) medication (Ibuprofen)

and that plaintiff's range of motion was better.  He diagnosed tendinitis and degenerative disease of the

right elbow. (Tr. 320-321).

On March 17, 2000, Dr. Carroll noted plaintiff's report of right elbow pain with the inability to

straighten his right arm, right foot pain, neck pain and left arm pain without stiffness. He also treated

plaintiff for a sore throat.  Plaintiff was diagnosed with degenerative arthritis and advised to take a

NSAID medication (Ibuprofen). (Tr. 334-335, 345-346).  On May 16, 2000, Dr. Carroll noted

"persistent painful swelling" of the right hand, arm and foot and he gave plaintiff a steroid injection and

---

[5] Most of Dr. Carroll's notations are not legible.

prescribed medication. (Tr. 341-342).  On May 30, 2000, plaintiff returned and Dr. Carroll noted the

swelling had improved with medication as had plaintiff's strength.  He diagnosed gout arthritis and

prescribed medication. (Tr. 343-344).

On June 14, 2000, plaintiff was consultatively evaluated by Andre Fontana, M.D., an

orthopedic physician.  Dr. Fontana noted plaintiff's medical history and report of pain in the neck,

back, shoulders, and legs.  He also noted plaintiff denied numbness and tingling but reported pain at the

bottom of his feet which increased with standing and walking and that his legs give way when he walks.

Plaintiff also reported that he did not cook, clean, drive or walk but could walk without assistance. (Tr.

336).  On physical examination, Dr. Fontana noted normal strength, reflex and sensation but identified

some limitation of range of motion of the neck, lumbar spine, right hand and right elbow.  X-rays of the

lumbar spine were normal but for "very minimal small anterior osteophyte[6] at the L4-5, L1-2 and L2-

3". (Tr. 337).  X-rays of the cervical spine were normal but for "minimal tiny osteophytes at the C&

level anteriorly" and slight loss of curve. (Tr. 337).  Dr. Fontana diagnosed mild degenerative disc

disease of the cervical and lumbar spin and "possibly gouty arthritis." (Tr. 337).  He concluded plaintiff

could perform light to medium exertional work. (Tr. 337).

Dr. Fontana completed a physical capacity evaluation wherein he found plaintiff could sit, stand

and walk for two hours at a time and for eight hours in an eight hour day.  He also found plaintiff could

---

[6] An osteophyte is commonly referred to as a "bone spur" which is a bony growth often
associated with osteoarthritis that occurs when your body attempts to repair damage caused by
osteoarthritis.  Bone spurs can result from other conditions such as injury or rheumatoid arthritis.  Mayo
Foundation for Medical Education and Research.  www.mayoclinic.com

continuously lift up to twenty five pounds and carry up to twenty pounds,  frequently lift up to fifty

pounds and carry up to twenty five pounds, and occasionally lift up to one hundred pounds and carry

up to fifty pounds but never more.  He found plaintiff was unlimited in the use of his hands for simple

grasping, pushing-pulling arm controls and fine manipulation, and was unlimited in the use of his legs for

repetitive actions.   He found plaintiff could continuously reach and frequently bend, squat, crawl, and

climb.  Dr. Fontana found plaintiff was moderately restricted from exposure to unprotected heights,

mildly restricted from work involving moving machinery and exposure to driving automotive equipment,

but was otherwise unrestricted. (Tr. 338).

On August 28, 2000, plaintiff was treated by Dr. Carroll for complaints of neck, shoulder and

back pain and generalized aching.  Dr. Carroll noted tight muscles and tenderness in plaintiff's neck and

shoulders. (Tr. 348).  He diagnosed arthritis and myalgia and prescribed an NSAID medication, "Heat

+ Exercise + Rest" and Glucosamine. (Tr. 349).  On October 27, 2000, Dr. Carroll noted plaintiff had

"ongoing pain in neck, shoulders, elbow and back." (Tr. 496).  On physical examination, it appears Dr.

Carroll noted plaintiff had "full range of motion [with] pain on [right] lat (sic) deviation." (Tr. 496).  He

also wrote that the "shoulder exam non-conclusive due to [patient] effort", "back has some pain on

palpation lumbar area", [right] elbow lacks 25 [degree] to full extension." (Tr. 496).  Dr. Carroll refilled

plaintiff's medication and prescribed "stretch and strengthening exercises." (Tr. 497).  On December 6,

2000, Dr. Carroll noted plaintiff's complaints of headache and ear ache and diagnosed an upper

respiratory infection.  Dr. Carroll wrote plaintiff was "[c]onfused [with] med but feels Allopurinal +

Soma + Ibuprofen are effective controlling pain." (Tr. 494).

On February 1, 2001, Dr. Carroll noted plaintiff's complaint of right arm pain and leg and foot

pain.  He noted plaintiff's upper respiratory infection had resolved and added another pain medication. (Tr. 492-493).  On February 13, 2001, plaintiff reported "pain all over" especially in the back of the neck radiating into the arms.  A cervical spine collar was prescribed for daily use and another pain medication was also prescribed. (Tr. 490-191).  On March 15, 2001, plaintiff returned to Dr. Carroll with complaints of body aches especially in the chest and right arm and prostate pain.  His medications were continued and Dr. Carroll noted he might refer plaintiff to another doctor if prostate pain continued. (Tr. 488-489).  On June 13, 2001, plaintiff reported body aches and a cough with fever. He was diagnosed with nasopharyngitis and bronchitis and anti-biotic medications were prescribed in addition to the pain medication.  Additional blood tests were ordered. (Tr. 486-487).

On July 24, 2001, plaintiff was involved in an automobile accident.  He reported "pain all over." (Tr. 449).  His chest and pelvic x-ray were normal. (Tr. 455, 456).  His cervical spine was "cleared" and he was released the next day after observation and receipt of a pain medication injection.  He was advised to obtain follow up medical care. (Tr. 448, 453, 448).

From August 1, 2001 until September 12, 2001, plaintiff was treated by James O. Gordon, D.C., a chiropractor with the Alabama Injury and Pain Clinic, Inc. (Tr. 457-477).  Plaintiff reported low and mid back pain, neck pain, bilateral shoulder pain and headaches resulting from the automobile accident. (Tr. 466).  Dr. Gordon diagnosed cervical strain/sprain, lumbar and thoracic segmental dysfunction and myofascitis. (Tr. 467).  Following approximately twenty three sessions, Dr. Gordon discharged plaintiff and noted his complaints were "minimal" and that he was at maximum medical improvement. (Tr. 457).  He also noted plaintiff was "discharged in improved condition, at times of increased activity, may experience an exacerbation of his condition." (Tr. 468).

12

On May 7, 2002, plaintiff returned to Dr. Carroll and reported "pain all over". (Tr. 483).   Dr. Carroll noted "generalized arthralgias, poly arthralgia syndrome" following the July 2001 automobile accident. (Tr. 483).  Plaintiff's blood sugar was elevated at 131 and Dr. Carroll indicated further tests might be needed in the future.  Plaintiff's gout was noted as stable following laboratory test results.  Dr. Carroll prescribed Naprosyn for pain. (Tr. 484).  Plaintiff's pain score was "6" (Tr. 483).  He also indicated his pain was worse with movement, relieved with lying down, and affected his sleeping, eating and walking.  Plaintiff described it as a "throbbing" pain that "comes & goes". (Tr. 485).  Plaintiff also reported that he was not taking any pain medication. (Tr. 485).

On May 15, 2002, plaintiff returned to Dr. Carroll and reported pain in the neck, back, shoulders, knee, feet, legs, chest, right arm and wrists.  Dr. Carroll noted plaintiff was walking with a cane and was in no apparent distress.  He found plaintiff was tender to palpation in the lumbar and thoracic area of his back.  Plaintiff's pain score was noted as "0". (Tr. 481).  A urinalysis showed traces of protein and glucose and fasting blood glucose test was ordered.  Plaintiff was advised to continue taking Celebrex. (Tr. 482).

Also, on May 15, 2002, Dr. Carroll completed a "Request for Medical Information" form to assist plaintiff in his application for food stamps.  Dr. Carroll indicated plaintiff could not work because of "inappropriate affect, poor memory, ... limitation of movement of [right] upper extremity [and right] lower extremities." (Tr. 480).  He indicated an onset date of November 9, 1999 and that the conditions are permanent. (Tr. 480).

On June 13, 2002, Dr. Carroll signed a letter on plaintiff's behalf in order for plaintiff to obtain financial assistance from the Alabama Business Charitable Trust Fund to pay his electric bill. (Tr. 478).

13

Also, on June 13, 2002, Dr. Carroll wrote the following letter in regard to plaintiff's inability to serve on jury duty.

> Mr. Rocky is a patient in my practice at Franklin Primary Health Center where he receives ongoing medical treatment. He is currently being treated for Gout, arthralgia, osteoarthritis, and other medical conditions. Due to his medical condition and medications prescribed to him, he is unable to serve on jury duty.

(Tr. 479).

On June 18, 2002, plaintiff reported to Dr. Carroll that he had burning with urination and that his urine had an "acid" smell. Dr. Carroll noted plaintiff's blood sugar was 272. He diagnosed non-insulin dependent diabetes mellitus and prescribed Glucotrol XL, an oral diabetic medication. (Tr. 522-523).

On July 2, 2002, Dr. Carroll noted "1st knowledge of being a diabetic" (Tr. 520). He also noted plaintiff's blood pressure was elevated and his blood sugar was 320. Plaintiff's pain score was noted as "0". (Tr. 520). His current medications were Allopurinol, Ibuprofen, Soma and Glucotrol XL, and Norvasc was added for hypertension. (Tr. 520).

On July 29, 2002, plaintiff was consultatively examined by Eric G. Becker, D.O.. (Tr. 498-499). Dr. Becker noted plaintiff's report of his medical history of past automobile accidents, gout, diabetes, hypertension, chest pain, and complaints of chronic musculoskeletal pain of the shoulders, neck and lower extremities. Dr. Becker noted plaintiff's records indicated he also has arthritis and was blind in his right eye. He identified plaintiff's activities as "light household duties" and basic activities of daily living. Plaintiff reported his current medications were Allopurinol, Hydrocodone, Norvasc, Glucotrol and Ibuprofen. (Tr. 198).

14

On physical examination, Dr. Becker found plaintiff's neck had "mildly diminished range of motion in all planes but [was] otherwise supple." (Tr. 499).  He found plaintiff's upper and lower extremities had strength at 4/5, including grip, and "unremarkable range of motion", his  "[a]nterior thoracolumbar flexion is from 0-90 degrees", plaintiff could "squat and rise, albeit he appears to do this with some difficulty" and that his gait was not "grossly impaired." (Tr. 499).  He also found plaintiff was alert and oriented and without neurological deficits but for the right eye blindness.  Dr. Becker diagnosed "chronic diffuse musculoskeletal pain, probably secondary to [degenerative joint disease]" with a history of two automobile accidents, a history of a burn to the right lower leg, "uncontrolled hypertension", diabetes, and right eye blindness. (Tr. 499).

Plaintiff returned to Dr. Carroll for a check-up on August 1, 2002.  His blood sugar was 155 and his blood pressure was elevated.  Another medication, Cardura, was added for his blood pressure. He was advised to return in three months. (Tr. 517-518).  On September 30, 2002, plaintiff reported constant pain.  His intensity pain score was reported as "0".  (Tr. 516).  His medications were refilled and Dr. Carroll discussed the use of over-the-counter pain medication. (Tr. 516-517).  On November 20, 2002, plaintiff returned with forms to be completed by Dr. Carroll.  He was diagnosed with hypertension and diabetes, his pain score was "0", and that he had no new problem but was waiting on his disability. (Tr. 514-515).  On December 30, 2002, plaintiff reported body pains and his intensity pain scale was rated as "8". (Tr. 511).  He was noted as being in "acute distress" and that he walked with a cane. (Tr. 511).  His medications were refilled and he was advised to return in three months.

On January 3, 2003, plaintiff saw Dr. Carroll for medication refills. His pain score was "0". (Tr. 509).  On January 27, 2003, plaintiff returned for a follow up visit but did not see Dr. Carroll.  His

current medications were Norvasc 5mg once a day for blood pressure, Glucotrol XL 10mg once a day for diabetes, Ibuprofen 800 mg three times a day for pain, Soma  (Carisprodol) 350 mg twice a day as a muscle relaxer and pain reliever, Allopurinol 100mg once a day for gout, Cardura 2mg once a day for blood pressure, Amaryl 4mg once a day for diabetes, and Arthrotec 50 mg once a day as a muscle relaxer.  Plaintiff reported a pain score of "0". (Tr. 538).

On February 19, 2003, Dr. Carroll noted plaintiff was "doing well", "again doing good compliant". (Tr. 536).  Again, his current medications were Norvasc 5mg once a day for blood pressure, Glucotrol XL 10mg once a day for diabetes,  Ibuprofen 800 mg three times a day for pain, Soma (Carisprodol) 350mg twice a day as a muscle relaxer and pain reliever, Allopurinol 100mg once a day for gout, Cardura 2mg once a day for blood pressure, Amaryl 4mg once a day for diabetes, and Arthrotec 50mg once a day as a muscle relaxer.  Plaintiff reported a pain score of "0". (Tr. 536).

On March 15, 2003, plaintiff was consultatively examined by R. Eugene Bass, M.D.  Dr. Bass reviewed and summarized plaintiff's medical records and noted plaintiff's report of his medical history. Dr. Bass also noted plaintiff's report of limited range of motion and chronic pain with almost all movement.  He noted plaintiff reported neck and back worsened with activity but painful at rest, right arm pain, left arm pain increased with dependence because of right arm pain, and pain into the legs greater on the right.  Plaintiff also reported that he was told he has a "pinched nerve." (Tr. 525). Plaintiff also complained of bilateral knee pain increased with "too much activity", squatting or climbing stairs or steps.  He also reported episodes of pain and swelling in his feet and ankles. (Tr. 525).

On physical examination of the upper extremities, Dr. Bass found reduced range of motion and reports of pain on motion of the neck and tenderness in the left neck and upper back area but without

spasm.  He also noted that plaintiff "was complaining of severe pain and demonstrating withdrawal to even light digital pressure which is felt to be a non-physiologic sign." (Tr. 526).  He noted plaintiff could "raise his hands over his head and place his hands behind his head and behind his back." (Tr. 526).  Dr. Bass noted a reduced range of motion in the right elbow with "significant tenderness" in the area of the "lateral epicondyle" but no swelling. (Tr. 526).  He noted the left elbow had full range of motion. (Tr. 526).

Dr. Bass noted plaintiff's back examination showed he could stand erect, had no palpable or visible spasms but had generalized tenderness greater on the left, and "again demonstrated complaints of rather significant pain to even light digital pressure and gentle pinch which are both considered non-physiologic signs." (Tr. 526).  He also noted a reduced range of motion on flexion and extension with complaints of pain. (Tr. 526).

In regard to plaintiff's lower extremities, Dr. Bass noted the old burn scaring to plaintiff's lower right leg.  He also noted plaintiff's knees had 0 to 130 degrees of range of motion with no instability, redness, heat or swelling and that plaintiff complained of pain on motion and exhibited tenderness. (Tr. 526-527).

On neurological examination, Dr. Bass found "a give away type weakness with complaints of pain" on strength testing for the upper and lower extremities.  He also found plaintiff's "[r]eflexes were difficult to evaluate as he demonstrated guarding and withdrawals secondary to complaints of pain merely with tapping the appropriate area with the reflex hammer."  He noted plaintiff could not toe walk, showed poor ability to heel walk, and did a partial squat.  His supine straight leg raise test was positive on the right but not the left. (Tr. 527).   Dr. Bass noted his impression of cervical and lumbar

17

degenerative disease, a pinched nerve according to plaintiff but with non-verifiable radicular pain, lateral epicondylitis and degenerative joint disease of the right elbow, degenerative joint disease of the knees, and "presence of non-physiologic signs suggestive of symptom magnification." (Tr. 527).

Plaintiff's x-rays of the lumbar spine indicated minimal or mild early spondylitic disc space narrowing and "small anterior marginal spurs of the superior and end plate of L4 and L5" with no compression, deformities or fractures and normal alignment. (Tr. 528). Plaintiff's x-rays of the cervical spine showed "moderate multilevel spondylitic disc changes" with "anterior spondylitic spurring and calcification in the anterior longitudinal ligament." (Tr. 529). Plaintiff's right and left knee x-rays showed mild osteoarthritic joint space narrowing and patellar spurring but no fracture or soft tissue abnormalities. (Tr. 530). Plaintiff's right elbow x-ray showed "advanced osteoarthritic changes of the elbow joint with coronoid and olecranon spurring" and a "likely old ununited medial epicondylar avulsion fracture." (Tr. 531).

Dr. Bass found plaintiff was limited to light exertional work. He also completed a physical capacities evaluation wherein he found plaintiff could sit, stand, and walk two hours each at a time and up to six hours each during an eight hour day; lift and carry up to ten pounds frequently and lift and carry up to twenty pounds occasionally; was unlimited in the use of his arms and legs; could occasionally bend and climb several steps, and frequently reach but could not squat, crawl or climb ladders. (Tr. 532). He also found plaintiff was moderately  restricted from work involving hazardous machinery and driving automotive equipment and totally restricted from work around unprotected heights. (Tr. 532).

On March 31, 2003, plaintiff returned to Dr. Carroll and reported a pain score of "1". (Tr.

18

534).  He also had elevated blood pressure at 150/108 but reported he had not yet taken his

medication.  His medications were refilled. (Tr. 534).

     **D.**      **Plaintiff's Argument**

     **1. Whether the Administrative Law Judge (ALJ) erred by failing to find that plaintiff's**

**severe impairments met or equaled a listing in the Listings of Impairments.  20 C.F.R. Pt. 404**

**Subpt. P, App. 1.**

     Plaintiff argues that his severe impairments of gout, arthritis, right eye blindness, hypertension,

diabetes, degenerative disc disease of the cervical and lumbar spine, degenerative disease of the right

elbow, and borderline intellectual functioning when considered in combination meet or medically equal a

Listing.

     The ALJ found plaintiff's severe impairments "when considered both singly and in combination,

do not rise to the level of severity necessary to either meet or equal the presumptively disabling medical

criteria set forth in any particular section" of the Listings. (Tr. 22).  The ALJ also found that plaintiff's

IQ of 76 exceeded Listing 12.05 criteria and that "no treating or other medical source has opined that

claimant's combined impairments met or equaled the criteria of any Listing[s]." (Tr. 22).

     The Eleventh Circuit explained the purpose and application of the Listings of impairments as

follows:

> The Listings include medical criteria for specified disorders of thirteen major body
> systems.  These impairments are so severe that an individual who has a listed
> impairment is generally considered unable to work based upon medical considerations
> alone. 20 C.F.R. § 416.925(a). A claimant may prove that he is disabled by either (1)
> meeting the Listings or (2) equaling the Listings.  In order to meet a Listing, the claimant
> must (1) have a diagnosed condition that is included in the Listing and (2) provide
> objective medical reports documenting that this condition meets the specific criteria of

> the applicable Listing and the duration requirement.  A diagnosis alone is insufficient. 20
> C.F.R. §416.925(c)-(d).  In order to equal a Listing, the medical findings must be at
> least equal in severity and duration to the listed findings.

Wilkinson on behalf of Wilkinson v. Bowen, 847 F. 2d 660, 663 (11th Cir. 1987); see also Bell v.

Bowen, 796 F. 2d 1350, 1353 (11th Cir. 1986) ("when a claimant contends that he has an impairment

meeting the listed impairments . . . , he must present specific medical findings that meet the various tests

listed under the description of the applicable impairment[.]"); see also Carnes v. Sullivan, 936 F. 2d

1215, 1218 (11th Cir. 1991) ("diagnosis of a listed impairment is not alone sufficient; the record must

contain corroborative medical evidence supported by clinical and laboratory findings").  Moreover, the

United States Supreme Court has found:

> Each impairment [in the Listings] is defined in terms of several specific medical signs,
> symptoms, or laboratory test results.  For a claimant to show that his impairment
> matches a listing, it must meet all of the specified medical criteria.  An impairment that
> manifests only some of those criteria, no matter how severely, does not qualify.

Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891-92 (1990) (emphasis in original).

In order to prove equivalency to a listed impairment, plaintiff must provide objective medical

evidence that support each of the criteria for the impairment under which equivalence is claimed. Bell,

796 F.2d at 1353 ("if in the alternative [claimant] contends that he has an impairment which is equal to

one of the listed impairments, the claimant must present medical evidence which describes how the

impairment has such equivalency.").  Plaintiff must show that the impairments produce functional

limitations or restrictions equivalent to those required under the particular listing.  Objective tests must

be present to support a finding of equivalence. 20 C.F.R. § 416.926(a); see Zebley, 493 U.S. at 530,

110 S.Ct. at 891-892 (1990).  Also, the medical findings must at least be equal in severity and duration

to the criteria in the listing.  Wilkinson, 847 F. 2d 662.  Plaintiff has the burden of producing medical

evidence that establishes all of the required medical findings to establish equivalency.  See Bowen v.

Yuckert, 482 U.S. 137, 146 n5, 107 S.Ct. 2287, 2294 (1987); see also 20 C.F.R. § 416.926

(determining medical equivalence for adults and children); 20 C.F.R. § 416.926a (determining

functional equivalence for children).

      Plaintiff's argument consists of one paragraph.  In the section entitled "Errors" plaintiff set forth

as follows:

> The combination of impairments do not meet or equal listing level for gout arthritis and
> the combination of impairment right eye blindness, hypertension and diabetes mellitus
> do not meet any listing level in the Social Security Regulation.  Borderline intellectual
> functioning combination of right eye blindness, hypertension, diabetes mellitus, gouty
> arthritis and degenerative disease lumbar/cervical and right elbow equal an listing level
> in the Social Security Regulation. (*sic*).

Doc. 11, page 4).

      Interpreting plaintiff's argument in the light most favorable to him, it appears he argues that his

borderline intellectual functioning, right eye blindness, hypertension, diabetes mellitus, gouty arthritis,

and spinal-cervical disc degenerative disc disease and right elbow degenerative disease when

considered in combination equal a Listing in the Social Security Regulation.  Plaintiff does not identify

the Listing to which he claims equivalence.  However, the ALJ after finding plaintiff has these severe

impairments stated as follows:

> Such impairments considered both singly and in combination, do not rise to the level of
> severity necessary to either meet or equal the presumptively disabling medical criteria
> set forth in any particular section listed in . . . [the Listings].  Claimant's 76 IQ score
> reflected in school records [Tr. 437-441] exceeds Listing 12.05 criteria; no treating or
> other medical source has opined that claimant's combined impairments met or equaled
> the criteria of any Listing[s].

(Tr. 22).  The ALJ then discussed the medical records from Dr. Gordon, Dr. Becker, and Dr. Bass, plaintiff' report of his daily activities and pain, and his treatment at Franklin Primary Health Center. (Tr. 22-24).

The medical records support the ALJ's decision that plaintiff's impairments singly and in combination do not meet or equal a Listing.  The consultative reports from Dr. Fontana,[7] Dr. Becker[8] and Dr. Bass[9] indicate that plaintiff has some restriction of motion and limitation of function from his severe musculoskeletal impairments and arthritis but the reports do not indicate listing level severity singly or in combination.

---

[7] On June 14, 2000, Dr. Fontana examined plaintiff and diagnosed mild degenerative disc disease of the cervical and lumbar spin and "possibly gouty arthritis." (Tr. 337).  He found plaintiff could perform light to medium exertional work. (Tr. 337).

[8] On July 29, 2002, Dr. Becker found plaintiff's neck had "mildly diminished range of motion in all planes but [was] otherwise supple." (Tr. 499).  He found plaintiff's upper and lower extremities had strength at 4/5, including grip, and "unremarkable range of motion", his  "[a]nterior thoracolumbar flexion is from 0-90 degrees", plaintiff could "squat and rise, albeit he appears to do this with some difficulty" and that his gait was not "grossly impaired." (Tr. 499).  He also found plaintiff was alert and oriented and without neurological deficits but for the right eye blindness.  Dr. Becker diagnosed "chronic diffuse musculoskeletal pain, probably secondary to [degenerative joint disease]" with a history of two automobile accidents, a history of a burn to the right lower leg, "uncontrolled hypertension", diabetes, and right eye blindness. (Tr. 499).   The records from Dr. Carroll indicate that plaintiff was diagnosed with hypertension and diabetes at about the same time as Dr. Becker's examination.

[9] On March 15, 2003, Dr. Bass found plaintiff was limited to light exertional work.  He also completed a physical capacities evaluation wherein he found plaintiff could sit, stand, and walk two hours each at a time and up to six hours each during an eight hour day; lift and carry up to ten pounds frequently and lift and carry up to twenty pounds occasionally; was unlimited in the use of his arms and legs; could occasionally bend and climb several steps, and frequently reach but could not squat, crawl or climb ladders. He also found plaintiff was moderately restricted from work involving hazardous machinery and driving automotive equipment and totally restricted from work around unprotected heights. (Tr. 532).  Dr. Bass noted that he reviewed plaintiff's medical treatment records and also obtained medical history and report of current symptoms from plaintiff.

Although plaintiff's treating physician at Franklin Primary Health Center, Dr. Carroll indicated on May 15, 2002, that plaintiff could not work because of "inappropriate affect, poor memory, ... limitation of movement of [right] upper extremity [and right] lower extremities" (Tr. 480) which arguably indicates a combined effect of plaintiff's severe impairments, there are no supporting notations or reports in Dr. Carroll's medical records to support this opinion in regard to "inappropriate affect" and "poor memory."  The ALJ noted that plaintiff had been treated for "whole body pain" by Dr. Carroll but that the

> objective findings documenting treatment are scarce, and the claimant [was] released to
> maximum medical improvement [by Dr. Gordon] with minimal musculoskeletal deficits
> within six weeks of his motor vehicle accident which is alleged as the onset of his
> current disability.

(Tr. 24).

Generally, the opinion of a treating physician must be given substantial weight, or credit, unless "good cause" is shown to the contrary. See Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).  However, an ALJ may properly discount the opinion of a treating physician if the opinion is conclusory, inconsistent with the treating physician's medical records, or if the evidence supports a contrary finding.  See Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)); Lewis, 125 F.3d at 1440; see also 20 C.F.R. § 404.1527(c)(2)(if medical evidence is internally inconsistent, the Commissioner may weigh all the evidence and make a decision if he can do so on the available evidence).  Also, if the ALJ decides to give less than controlling weight to the treating physician's opinion he must clearly articulate the reasons.  Marbury v. Sullivan, 957 F. 2d 837, 841 (11th Cir.

1992) (per curiam); Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987).  Also, the reasons must be

legally correct and supported by substantial evidence in the record. Lamb v. Bowen, 847 F.2d 698,

703 (11th Cir.1988).

      As noted, the ALJ relied upon Dr. Gordon's release of plaintiff following chiropractic treatment

post-accident and also the intermittent treatment records from Dr. Carroll. (Tr. 24-25). In that regard,

Dr. Carroll's records consist of treatment in November 1999, March 2000, May 2000, August 2000,

October 2000, November 2000 and December 2000 for gout, degenerative joint disease in the right

elbow and resulting pain which improved with NSAID medication. (Tr. 320-324, 334-335, 348, 496-

497, 494).  In December of 2000, Dr. Carroll noted plaintiff's pain was controlled with medication for

gout, a muscle relaxer and Ibuprofen. (Tr. 494).  In 2001, Dr. Carroll treated plaintiff again in

February, March, June, and July for complaints of body pain and other health conditions including a

respiratory infection and prostate pain. (Tr. 486-493).

      After plaintiff's accident in July 2001, he was treated by Dr. Gordon and did not return to Dr.

Carroll until May 7,  2002. (Tr. 483).  Plaintiff reported body pain and indicated a pain score of "6" but

also reported that he was not taking pain medication. (Tr. 485).  However, at his visit on May 15,

2002, he reported a pain score of "0" and that he was taking Celebrex. (Tr. 481).  In June 2002

plaintiff was diagnosed with diabetes (Tr. 522-523) and in July 2002 he was diagnosed with

hypertension. (Tr. 520-521).  Following these diagnosis, he saw Dr. Carroll almost monthly for blood

pressure and blood glucose checkups and sometimes reported body pains. (Tr. 509-519).  On one

occasion in December 2002, plaintiff reported a pain score of "8". (Tr. 511-513).  However, on

January 3, 2003 and January 27, 2003, he reported a pain score of  "0". (Tr. 509, 538).  On February

19, 2003, Dr. Carroll reported plaintiff was "doing well", "again doing good compliant". (Tr. 536). Plaintiff reported a pain score of "0". (Tr. 536).  Dr. Carroll did not report any functional limitation resulting from plaintiff's diabetes or hypertension and even though he noted plaintiff's reports of neck, back, shoulder, right elbow, and leg pain, he did not note any restriction of plaintiff's activities in his medical records but for one time in August 2000 when he recommended heat, exercise and rest. (Tr. 349).

Accordingly, the undersigned finds that the ALJ did not err by finding plaintiff's severe impairments considered singly or in combination did meet or equal a listing and that substantial evidence in the record supports his determination.

**2. Whether the ALJ should have applied the Medical-Vocational Guidelines to determine that plaintiff was disabled. 20 C.F.R. Pt. 404 Subpt. P, App. 2.**

Plaintiff argues that the ALJ erred by determining that he was forty eight years old because he is fifty years old.  Plaintiff argues that the ALJ erroneously found he could perform light exertional work. He also argues that his illiteracy in combination with his age and limitation to sedentary work would require a finding that he is disabled.

Initially, the undersigned notes that plaintiff was forty eight years old at the time of the ALJ's decision on June 18, 2003.  Plaintiff listed his date of birth as September 1, 1954. Plaintiff appears to reference the Medical Vocational Guidelines which states that

> The term younger individual is used to denote an individual age 18 through 49. For individuals who are age 45-49, age is a less advantageous factor for making an adjustment to other work than for those who are age 18- 44. Accordingly,  a finding of "disabled" is warranted for individuals age 45- 49 who: (i) Are restricted to sedentary work, (ii) Are unskilled or have no transferable skills, (iii) Have no past relevant work

or can no longer perform past relevant work, and (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

20 C.F.R. Pt. 404, Subpt. P, App. 2., 201.00(h)(1).  This guideline addresses the circumstance wherein the disability applicant's "[m]aximum sustained work capability [is] limited to sedentary work." Id.

Plaintiff focuses on the last sentence and argues that he is illiterate.  The regulations define illiteracy as "the inability to read or write." 20 C.F.R. § 416.964(b)(1).  ("We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.").  However, at the hearing plaintiff testified that he completed the tenth grade and can perform simple reading, writing, and math.  He also testified that he took the written examination twice to receive his driver's license. (Tr. 78).

In order for this Guideline element to apply, plaintiff must establish that he is unable to read or write in English.  By his own testimony, plaintiff admits that he can read and write albeit simple reading and writing.  Thus the ALJ did not err by not finding plaintiff disabled under the above cited Medical Vocational Guidelines.

The ALJ determined that plaintiff was capable of performing light exertional work.  In a one sentence statement, plaintiff asserts that the ALJ erred.  However, substantial evidence in the record supports the ALJ's decision that plaintiff is capable of performing light work and consequently, sedentary exertional work.  Light exertional work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or

carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §404.1567(b) (2005); 20 C.F.R. §416.967(b) (2005).

As previously discussed, two of the three consultative examiners found plaintiff could perform light exertional work. (Tr. 337, 532).  Also, plaintiff's treating physician did not record  any recommendation to plaintiff to restrict his activities but for one time in August 2000 when he recommended "Heat + Exercise + Rest". (Tr. 349).  Additionally, the ALJ also relied upon the assessment of a non-examining agency physician as support for the postural limitations included in plaintiff's residual functional capacity and the ALJ was within his authority to do so.[10]  The opinions of state agency reviewing physicians should be treated by the ALJ as expert opinion evidence of nonexamining sources.  See Social Security Ruling 96-6p: Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence 1996 WL 374180.  Also, the ALJ may rely upon the opinion of a non-examining agency physician if the opinion is consistent with the reports of examining physicians.  Edwards v. Sullivan, 937 F.2d 580, 585 (11th Cir. 1991).  Accordingly, the undersigned

---

[10] On August 23, 2002, the non-examining agency physician reviewed the medical and administrative record and found plaintiff could perform work at the medium exertional level but was restricted from work that involved more than occasional stooping. (Tr. 500-508).

finds that substantial evidence supports the ALJ's decision that plaintiff could perform light exertional work with postural restrictions.

### 3.  Whether the number of jobs identified by the ALJ constitutes a significant number of jobs in the national and local economy.

Plaintiff argues that the number of jobs identified by the ALJ do not constitute a significant number of jobs in the national and local economy.  Plaintiff points out that the ALJ identified only 156 local jobs for parking attendant.

Although plaintiff argues that the number of local jobs does not constitute a significant number of jobs, the United States Supreme Court has held that "[t]he appropriate focus under the regulation . . . is the national economy." Matthews v. Eldridge, 424 U. S. 319, 336, 98 S. Ct. 893, 903 (1976). ("Work which 'exists in the national economy' is in turn defined as 'work which exists in significant numbers either in the region where such individual lives or in several regions of the country.'§ 423(d)(2)(A)." Id. at n. 14 ); see also 42 U.S.C. § 423(d)(2)(A) (a plaintiff will be considered disabled only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful activity which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."); 20 C.F.R. § 416.966(a).

Because plaintiff established that he cannot return to his past relevant work, the burden of proof shifted to the Commissioner to prove plaintiff is capable, considering his age, education, residual functional capacity, and past relevant work, of engaging in other kinds of substantial gainful activity.

28

Cannon v. Bowen, 858 F.2d 1541, 1544 (11th Cir. 1988).  To meet this burden, the ALJ must

articulate specific jobs that plaintiff is capable of performing and the jobs identified must be available in

significant numbers in the national economy not just the geographic area where plaintiff resides.  Allen v.

Bowen, 816 F. 2d 600, 603 (11th Cir. 1987).  In Allen, the Eleventh Circuit found that "174 positions

of small appliance repairer attested to by the VE exist in his local economy" and that this number

constituted a significant number of jobs. Id. at 602.  In the present case, the VE identified the jobs of

table attendant which included 60 positions locally, 2,277 statewide and 372,053 nationally; cleaner

such as an office cleaner which included 355 positions locally, 2,688 statewide and 177,404 nationally;

and parking lot attendant which included 45 positions locally, 156 statewide and 45,102 nationally. (Tr.

121-122).  The ALJ identified these jobs in his decision as other work which plaintiff could perform

with his residual functional capacity.  Accordingly, the undersigned finds that substantial evidence

supports the ALJ's determination that there are a significant number of jobs in the local, state and

national economy which plaintiff can perform.

**4. Whether the ALJ erred by failing to discuss or mention all of plaintiff's medication.**

Plaintiff argues that the ALJ erred by failing to discuss or mention all of his medication.[11]   At

the hearing on June 3, 2003, plaintiff reported that he takes Allopurinol 100mg once a day for gout;

Ibuprofen 800mg three times a day for pain, Carisprodol 350mg twice a day as a muscle relaxer and

---

[11] Plaintiff cites to Brady v Heckler, 724 F. 2d 914, 918 (11th Cir. 1984) and Jones v.
Schweiker, 551 F. Supp 205 (D.C. Md. 1982) in support of his argument.  However, these cases do
not address the issue of whether an ALJ errs by failing to discuss or mention all of plaintiff's medication.
Brady and Jones addressed the ALJ's failure to find that the plaintiff had a severe impairment at step
two of the sequential evaluation process.

pain reliever, and Arthrotec 50mg once a day as a muscle relaxer; Glucotrol XL 10mg once a day and

Amaryl 4mg once a day for diabetes; and Accupril 20mg once a day, Norvasc 5mg once a day, and

Cardura 2mg once a day for blood pressure. (Tr. 444).  Previously on May 14, 2003, plaintiff reported

taking Ibuprofen, Glucotrol XL, Carisoprodol, Allopurinol, Norvasc and Cardura, in the same amounts

as listed for June 3, 2003. (Tr. 446).  All medications were prescribed by Dr. Carroll.  At his most

recent visit on March 31, 2003, plaintiff's current medications were Ibuprofen 800mg three times a

day, Carisoprodol 350mg twice a day, Allopurinol 100mg twice a day, Norvasc 5mg once a day,

Cardura 2mg once a day and Glucotrol XL 10mg once a day. (Tr. 534).[12]

Plaintiff's treatment records and reports to the consultative medical doctors indicate that he may

have taken all of the medications presented at the hearing at some point in time but the records do not

support a finding that he took all of the medications on a daily basis.

The ALJ did not specifically address each medication.  However, in discussing plaintiff's

subjective symptoms, including pain, the ALJ noted that he must consider the requirements of 20

C.F.R. § 416.929. (Tr. 24).  The regulation states that the ALJ should consider "the information that

you, your treating or examining physician or psychologist, or other persons provide about your pain or

other symptoms (e.g., . . . what medications, treatments or other methods you use to alleviate them, . .

.)" and that the "type, dosage, effectiveness, and side effects of any medication you take or have taken

to alleviate your pain or other symptoms)" is a factor for consideration. Id. at (c)(3).  The ALJ also

stated that in addition to considering plaintiff's testimony and any medical opinions, he must also

_____

[12] In August 2000, Dr. Carroll wrote plaintiff was "[c]onfused [with] med but feels Allopurinal
+ Soma + Ibuprofen are effective controlling pain." (Tr. 494).

consider "the use of medication and other methods for relief of symptoms". (Tr. 24-25).

Plaintiff testified that he takes several daily maintenance medications for diabetes and hypertension but, in regard to pain, it appears he most consistently takes Allopurinol to control his gout and Ibuprofen and Carisprodol (Soma) for pain.  The record shows that various pain medications have been prescribed for intermittent periods since 1999.  Plaintiff has taken Excedrin, Tylenol 3, Naprosyn, Celebrex, Voltaren, Arthrotec and received two corticosteroid medication injections (Kenalog). He has also taken glucosamine and calcium.

However, in a case where the ALJ failed to mention one of plaintiff's medications after discussing other medications, the Eleventh Circuit recently held as follows:

> In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, as was not the case here, is not a broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole." Foote[ v. Chater, 67 F. 3d 1553, 1561 (11th Cir. 1995)](internal quotation omitted).  Our standard of review is, as it is for the district court, whether the ALJ's conclusion as a whole was supported by substantial evidence in the record. See Foote, 67 F. 3d at 1558.

Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).   Accordingly, the undersigned finds that the ALJ did not commit reversible error by failing to mention and discuss plaintiff's medications individually. The ALJ's statement that he considered plaintiff's medication as a factor in reaching his residual functional capacity and credibility determinations is sufficient for review when considered with plaintiff's testimony regarding his medication, the two lists of medications presented at and near the time of the hearing, and the list of current medications found in the Franklin Center records.

**5. Whether the ALJ properly assessed plaintiff's subjective complaints of disabling**

**pain.**

Reading plaintiff's argument entitled "Disabling Pain" in the light most favorable to him, it appears he argues that there is objective medical evidence of underlying conditions which could reasonably give rise to the pain he alleges even though there is no objective medical evidence to document the intensity of the pain. Plaintiff also argues that the ALJ may not rely on minimal daily activities as substantial evidence that he does not suffer disabling pain.

The ALJ noted that he was required to evaluate plaintiff's subjective allegations of pain under the Eleventh Circuit standard set forth in Holt v. Sullivan, 921 F. 2d 1221, 1223 (11th Cir. 1991) and that he must assess the plaintiff's credibility pursuant to Social Security Ruling 96-7p: Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing The Credibility of an Individual's Statements, 1996 WL 374186. (Tr. 21, 24).  Holt provides that in order to obtain disability based upon subjective complaints of pain, the plaintiff must establish  "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986)).

In regard to plaintiff's credibility, the ALJ found that "[a]fter review of the full record", plaintiff's "testimony of disabling level pain is not in accordance with the medical evidence of record in its entirety, therefore, credibility can only be assigned within the context of the evidence." (Tr. 25).  In his findings, the ALJ found that plaintiff's testimony was not consistent with the medical evidence and did "not support a disabling level of impairment." (Tr. 26).  In support of this finding, the ALJ, as previously

32

discussed, noted Dr. Carroll treated plaintiff for complaints of "whole body pain" but that the "objective findings documenting treatment are scarce[.]" (Tr. 24).  The ALJ also noted that Dr. Gordon, plaintiff's treating chiropractor, had "released [plaintiff] to maximum medical improvement with minimal musculoskeletal deficits within six weeks of his motor vehicle accident which is alleged as the onset of his current disability." (Tr. 25).  The ALJ noted that when plaintiff began treatment with Dr. Gordon in July 2001, he reported that he was pain free, even though he alleges severe pain since his 1994 automobile accident. (Tr. 25, 471).[13]  The ALJ also noted that since that date, plaintiff received "little treatment" until filing his application for benefits in April 2002. (Tr. 25).  The ALJ also noted that plaintiff's use of a cane was without prescription and that there was no underlying medical condition to warrant use of a cane. (Tr. 25).  The ALJ also noted that plaintiff's allegation that he could lift no more than a cup of coffee was not credible. (Tr. 25).

In regard to plaintiff's daily activities, the ALJ found that in addition to considering plaintiff's testimony and any medical opinions to reach a credibility determination regarding plaintiff's allegations of disabling pain, he must also consider plaintiff's daily activities in assessing plaintiff's credibility. (Tr. 24-25).  However, in making his credibility determination he did not specifically reference any report of daily activities but for plaintiff's statement that he could not lift a cup of coffee. (Tr. 24-25, 96, 103).[14]

---

[13]  The record shows a notation that "[patient] was not hurting at the time of this accident." (Tr. 471).

[14]  At the hearing, plaintiff testified that he has pain when he tries to shake someone's hand or lift a cup of coffee and sometimes his coffee cup would slip out of his hand.  (Tr. 103, 96).  In regard to daily activities, plaintiff testified that he sleeps poorly for about two or three hours each night because of pain.  Each day, he prepares food such as sandwiches to eat when he takes his medications.  He attempts light housework when he feels up to it but usually he is hurting and his friends help him shop. (Tr. 99, 104).  Plaintiff's therapist recommended he try outdoor chores so he mows his small lawn with

33

If the plaintiff meets the requirements for the pain standard, then the ALJ should make a credibility determination. See Marbury v. Sullivan, 957 F. 2d 837, 839 (11th Cir. 1992). ("After considering a claimant's complaints of pain, the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence."). The ALJ did not specifically state that plaintiff met the pain standard, however, he did assess plaintiff's credibility regarding allegations of disabling pain.[15]

In Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995), the Eleventh Circuit set forth as follows:

A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court. MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir.1986). A lack of an explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir.1982). While an adequate credibility finding need not cite "particular phrases or formulations ... broad findings that [a claimant] lacked credibility and could return to her past work alone are not enough to enable us to conclude that [the ALJ] considered her medical condition as a whole." Jamison v. Bowen, 814 F.2d 585, 588-90 (11th Cir. 1987). If proof of disability is based upon subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (ALJ did not specifically address testimony by claimant and her daughter about claimant's pain). Explicit credibility findings are "necessary and crucial where subjective pain is an issue." Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982).

Id. at 1561-67. Additionally, when making a credibility determination, the ALJ may consider plaintiff's daily activities. Macia v. Bowen, 829 F. 2d 1009, 1012 (11th Cir. 1987); see also 20 C.F.R. §

---

a riding lawn mower. (Tr. 99-100, 104).

[15] The ALJ did note that the "evidence establishes that the claimant's allegations include pain secondary to neck and back injuries that extend throughout his body" (Tr. 24) and found that plaintiff has the severe impairments of gout, arthritis, degenerative disease of the spine and degenerative disease of the elbow. (Tr. 22, 26).

416.929(c)(3)(i) ("Factors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities[.]").  Moreover, "[t]he credibility of witnesses is for the [Commissioner] to determine, not the courts." Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991) citing Kelly v. Heckler, 736 F.2d 631, 632 (11th Cir.1984).

Because the record contains substantial evidence to support the ALJ's decision to discredit plaintiff's subjective complaints of pain and because the ALJ applied the proper legal standard, the undersigned finds that the ALJ did not commit reversible error by finding plaintiff's subjective allegations were not credible to the extent that plaintiff established a disabling level of impairment.  The ALJ gave specific reference to items of evidence to support his decision as required by Foote and the evidence cited is supported by substantial evidence in the record.  The ALJ referred to limited treatment at Franklin Clinic and review of the records indicate that plaintiff reported pain at a rate of six and eight on scale of one to ten on one occasion each.  (Tr. 511, 483).  The remainder of plaintiff's pain reports were scored at zero or one.  The record also indicates that Dr. Gordon released plaintiff at maximum medical improvement, that plaintiff did not return to Dr. Gordon for further chiropractic care after September 12, 2001, and that plaintiff did not seek treatment at Franklin Center until May 2002. (Tr. 457-477, 483).  Also, as the ALJ stated, plaintiff testified to weakness and pain in his arms to the extent that he sometimes could not lift or hold a coffee cup or a gallon of milk. (Tr. 103).  However, the consultative examiners, Dr. Fontana, Dr. Bass and Dr. Becker did not find upper extremity weakness which would support his allegation.[16]  Instead, Dr. Fontana and Dr. Bass both indicated plaintiff was

---

[16] Dr. Fontana found normal strength, reflex and sensation but identified some limitation of range of motion of the neck, lumbar spine, right hand and right elbow. (Tr. 337).  Dr. Becker found

unlimited in the use of his arms and could perform light exertional work.  Also, the records from

Franklin Center do not show that plaintiff reported such an extreme level of weakness or pain to Dr.

Carroll.

## VIII.   <u>Conclusion</u>

For the reasons set forth, and upon consideration of the administrative record and the

memoranda of the parties, and oral argument, it is recommended that the decision of the Commissioner

of Social Security denying plaintiff's claim for Social Security disability insurance benefits and

supplemental security income be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and</u>

<u>recommendation.</u>

**DONE** this 30th day of June, 2005.

<u>s / Kristi  D.  Lee</u>
**KRISTI   D.   LEE**
**UNITED STATES MAGISTRATE JUDGE**

---

plaintiff's upper and lower extremities had strength at 4/5, including grip, and "unremarkable range of
motion". (Tr. 499).  Dr. Bass found plaintiff could "raise his hands over his head and place his hands
behind his head and behind his back." (Tr. 526).  Dr. Bass noted a reduced range of motion in the right
elbow with "significant tenderness" in the area of the "lateral epicondyle" but no swelling and that the
left elbow had full range of motion. (Tr. 526).

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

1.      <u>**Objection**</u>.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      <u>**Opposing party's response to the objection.**</u>  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      <u>**Transcript (applicable where proceedings tape recorded)**</u>.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

   s / Kristi  D. Lee
   **UNITED STATES MAGISTRATE JUDGE**